UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | No. 4:15 CR 469 RWS (SPM) |
| MELVIN MIMS, | ) | |
| Defendant. | ) | |

# REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

In accordance with the Memorandum filed herein,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence (Doc. 36) and Motion to Suppress Statements (Doc. 35) be **DENIED.**

**IT IS FURTHER RECOMMENDED** that the United States' Motion for pretrial determination of the admissibility of defendant's statements (Doc. 8) be **GRANTED**.

The parties are advised that they have **fourteen (14)** days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained; failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Trial in this case has been set on **September 6, 2016**, at **9:00 a.m.** before the Honorable Rodney W. Sippel.

/s/ Shirley Padmore Mensah
_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 24th day of June, 2016.

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:15 CR 469 RWS(SPM) |
| | ) | |
| MELVIN MIMS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b).

### BACKGROUND AND PROCEDURAL HISTORY

Defendant Melvin Mims is charged in an indictment with one count of possessing with intent to distribute cocaine base ("crack"), in violation of 21 U.S.C. § 841(a) (Count One); one count of possessing a firearm in furtherance of his possession with intent to distribute cocaine base ("crack"), in violation of 18 U.S.C. § 924(c) (Count Two); and one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) (Count Three). Mims was arrested without a warrant on September 22, 2015, after officers observed Mims engage in activity they believed was consistent with drug trafficking and observed Mims commit several traffic violations. At the time of Mims' arrest, the arresting officers seized two firearms and controlled substances from Mims' person and vehicle. Following his arrest, Mims made statements to police and to an Assistant Circuit Attorney.

Mims has moved to suppress his statements (Doc. 37) and physical evidence (Doc. 36). The United States has moved for pretrial determination of the admissibility of defendant's statements (Doc. 8). On April 1, 2016, the undersigned held an evidentiary hearing on Mims' pretrial motions. At the conclusion of the hearing, defense counsel made an oral motion for time to file a post hearing brief. The

undersigned granted that motion and, at counsel's request, ordered a written transcript of the evidentiary hearing to assist in preparing the report and recommendation (Doc. 66). A transcript of the evidentiary hearing was filed on April 28, 2016 (Doc. 67). Mims' post-hearing brief was filed on May 24, 2016 (Doc. 73). The United States filed its post-hearing brief on May 31, 2016 (Doc. 74). Thus, Defendants' motions to suppress are fully briefed and ready for a ruling.

Based upon the evidence adduced at the hearing on the motion to suppress, as well as a review of the transcript of the hearing in this matter, and the briefs of the parties, the undersigned makes the following findings of fact and conclusions of law:

I. **FINDINGS OF FACT**

The evidence presented consisted of testimony by St. Louis City Police Department Detective Ronald Vaughn; an aerial map of Defendant's route of travel (Govt. Exh. 1); traffic citations issued to Defendant (Govt. Exhs. 2A, 2B, 2C); a written *Miranda* Warning/Waiver form (Govt. Exh. 3); an audio recorded interview of Defendant (Govt. Exh. 4); and a video recorded interview of Defendant (Govt. Exh. 5). Defense counsel cross examined Detective Vaughn but did not present any witnesses or exhibits at the evidentiary hearing. Based on my observations of Detective Vaughn at the evidentiary hearing, I found Detective Vaughn's testimony to be credible and reliable.

   A. *Informant's Tip in July 2015*

Beginning in July 2015, Detective Ronald Vaughn, a special operations detective with the St. Louis City Police Department, received information from a confidential informant that Mims, also known as "Wayne Bang," was selling crack cocaine and committing violent crimes throughout the Walnut Park and Baden neighborhoods in the City of St. Louis. The informant advised Detective Vaughn that Mims frequently carried a firearm and cautioned the detective to use extreme caution when encountering Mims because he was believed to have committed multiple homicides. The informant also advised that Mims would likely flee in a vehicle if officers tried to stop him. The informant told Detective Vaughn that Mims drove a yellow Ford Mustang with Missouri plates. The informant gave Detective Vaughn Mims' license

plate number and advised that Mims got the drugs he sold from a trap house in the Baden neighborhood, an area known by Detective Vaughn as a high crime area, including drug trafficking.

At the time he received this information, Detective Vaughn was an eight year veteran of the police department, and was familiar with both Mims and the informant. Specifically, Detective Vaughn had become familiar with Mims after learning from SWAT officer William Wethington that officers had executed a search warrant at a residence on Sherry associated with Mims and had seized multiple guns and some marijuana. As for the confidential informant, Detective Vaughn had worked with the informant in the past and he/she had proven reliable in that information provided by the informant in the past had resulted in arrests and convictions in both state and federal court. Detective Vaughn spoke with the informant multiple times in July 2015 both over the telephone and in person.

After he received the foregoing information from the informant, Detective Vaughn ran a computer/Internet search and found a public Facebook profile for "Wayne Bang" which featured multiple pictures of Mims clad in gang attire. Detective Vaughn also ran computer inquiries in law enforcement databases and saw that Mims had been arrested in the past for assault first, shootings, robbery first, drugs, and other violent crimes. The detective's inquiry also revealed that Mims had prior felony convictions. A Missouri Department of Revenue search further revealed that Mims did not have an active driver's license and that the license plates on the Mustang belonged to a 2013 Dodge Avenger.

### B. *Arrest of Mims on September 22, 2015*

On September 22, 2015, Detective Vaughn received a telephone call from the same informant who had previously provided information about Mims. The informant told Detective Vaughn that Mims was parked at the corner of Wall and Broadway picking up crack cocaine from the trap house and was armed with a handgun. At the time he spoke to the informant, Detective Vaughn was with Detective Laurence O'Toole; both officers responded to the area in an unmarked police car. Once there, they spotted the yellow Mustang described by the informant and set up surveillance. The car was at the corner of Wall and

Broadway, the location identified by the informant as Mims' trap house.[1] The car's engine appeared to be running and there appeared to be a passenger but there was no one sitting in the driver's seat. After approximately ten minutes, Mims walked out of the apartment complex of the suspected trap house, looked from side-to-side, as if looking for police; adjusted his waistband, as if trying to maintain control over a weapon; and entered the driver's seat of the yellow Mustang. Approximately one minute later, a Dodge Charger pulled up along the driver's side of the Mustang; and Mims and the driver of the Charger appeared to engage in what detective Vaughn believed was a hand-to-hand drug transaction. Less than a minute later, a second car pulled up along the driver's side of the Mustang and the officers observed what appeared to be another hand-to-hand drug transaction between Mims and the driver of the second car. Following the second transaction, Mims began to drive away from the trap house location.

Given the informant's advice that Detective Vaughn approach Mims with extreme caution, the detectives decided to call for backup before approaching Mims. They followed Mims in their unmarked car for approximately fifteen minutes, crossing from the City of St. Louis into St. Louis County. In the process, the officers observed Mims commit multiple traffic violations including operating a motor vehicle without a valid driver's license and driving a vehicle with improper license plates. Detective Vaughn temporarily lost sight of Mims' vehicle for approximately ten minutes. When he regained sight of the Mustang, it was in the parking lot of an AutoZone located at Jennings Station Road and Halls Ferry. The hood of the Mustang was up and Mims was standing outside the car. After Detectives Vaughn and O'Toole had air support from a police helicopter, but before the requested backup officers arrived, they decided to approach Mims before he got back into the Mustang.[2]

---

[1] Detective Vaughn explained that a trap house is a house that is used, typically by gang members, to sell drugs out of and store weapons. Evid. Hearing Tr. P. 13.

[2] Although it is not entirely clear whether Detective Vaughn was intending to arrest Mims or simply question him, what is clear is that the officers intended to detain/seize Mims based on information they had received up to that point. Detective Vaughn testified that they chose to approach Mims before the police backup arrive because they were concerned that permitting Mims to return to the Mustang where he may have had access to a weapon and/or may have attempted to flee would increase risks to the officers and to any bystanders.

The detectives activated the lights and sirens on their unmarked police car and pulled up their vehicle such that their car was "nose-to-nose" to Mims' Mustang. Mims was facing the Mustang with his back to the officers as they approached. Detective Vaughn walked up behind Mims and observed a bag of marijuana protruding from his back pocket. He immediately placed Mims in handcuffs and advised that he was under arrest. Detective Vaughn conducted a pat-down for weapons, which revealed no weapons. Detective Vaughn also conducted a further pat-down for further illegal contraband and found crack cocaine in Mims' other pocket. Detective Vaughn then placed Mims (still handcuffed) in back seat of the police car.

Meanwhile, Detective O'Toole approached the front seat passenger in the Mustang, a juvenile who identified himself as Patrick Franklin. When he approached Franklin, Detective O'Toole observed a handgun sitting on the floor where Franklin was sitting. Detective O'Toole removed Franklin from the Mustang, placed him in handcuffs, and seized the firearm found on the floor board of the Mustang. Detective Vaughn subsequently searched the vehicle for further weapons and located another firearm in the center console as well as some paperwork related to a car payment that bore Mims' name.

After securing the seized weapons, Detective Vaughn advised Mims of his *Miranda* rights by reading from a card, and Mims indicated he understood his rights. Detective Vaughn then told Mims that they had found two firearms in the vehicle. Before Detective Vaughn could ask any questions, Mims stated that both firearms were his. At Detective Vaughn's request, Mims described the firearms and then volunteered that he had recently purchased the firearms from "Crack Head Charlie" because his girlfriend and been recently robbed and he believed he was the target of the robbery. Detective Vaughn advised Mims that he would be presenting charges to the St. Louis City Circuit Attorney's Office for two counts of unlawful possession of a firearm by a felon, and two counts of possession of a controlled substance. Detective Vaughn also issued three traffic citations to Mims for traffic violations he observed while following Mims. *See* Govt. Exhs. 2A, 2B, & 2C. Mims was eventually transported to the St. Louis City Central Patrol for booking.

### C. *Mims' Interviews on September 22 & 23, 2015*

Once Mims was at Central Patrol, Detective Vaughn booked him and then conducted an audio recorded interview of Mims. *See* Govt. Exh. 4. While he was booking Mims, Detective Vaughn did not question Mims about the investigation, Mims' arrest, or the officers' observations. However, before interviewing Mims, Detective Vaughn once again read Mims his *Miranda* rights from a form and Mims signed a written warning and waiver form. *See* Govt. Exh. 3. Mims then proceeded to make incriminating statements including an admission to possession of the firearms found in the car, crack cocaine, and marijuana. Mims also made statements about where he acquired the firearms.

The following day, on September 23, 2015, Mims was interviewed by a prosecutor in the Circuit Attorney's Office. The interview was video recorded. Before Mims was asked any questions, he was read his rights from a form. The prosecutor confirmed that Mims understood his rights then explained that she was not there to represent Mims; rather, she advised him that she worked for the state and they were reviewing the case. Mims indicated that he understood and indicated his willingness to speak with the prosecutor. Mims then proceeded to make incriminating statements including admitting that he purchased and possessed firearms when he knew he was not supposed to have a weapon, and that that he was in possession of marijuana and crack cocaine at the time of his arrest.

### CONCLUSIONS OF LAW

### I. MOTION TO SUPPRESS EVIDENCE (DOC. 36)

Mims moves to suppress physical evidence, including the firearms seized from his car and the drugs seized from his person at the time of his arrest. Mims contends his warrantless arrest and the search and seizure of items from his person and his car were unconstitutional and not supported by probable cause. For the reasons set out below, I disagree.

#### A. *The detectives had probable cause to arrest Mims.*

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend.

IV. In general, unless they fall within a valid exception, searches and seizures are *per se* unreasonable and invalid unless based on probable cause and executed pursuant to a warrant. *See Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011) (Fourth Amendment imposes presumptive warrant requirement for searches and seizures); *Katz v. U.S.*, 389 U.S. 347, 357 (1967) (Fourth Amendment imposes presumptive warrant requirement for searches and seizures). However, an officer may conduct a warrantless arrest without running afoul of the Fourth Amendment if the officer has probable cause to believe the arrestee has committed an offense in the officer's presence. *See United States v. Webster,* 625 F.3d 439, 442 (8th Cir. 2010). "Probable cause to make a warrantless arrest exists when, considering all the circumstances, police have trustworthy information that would lead a prudent person to believe that the suspect has committed or is committing a crime." *Webster,* 625 F.3d at 442 *(quoting United States v. Parish*, 606 F.3d 480, 486 (8th Cir. 2010)). In making this determination, "law enforcement officers have substantial latitude in interpreting and drawing inferences from factual circumstances." *Id.* (quoting *United States v. Henderson*, 613 F.3d 1177, 1181 (8th Cir. 2010) (internal quotation marks and citation omitted)). "A probability or substantial chance of criminal activity, rather than an actual showing of criminal activity is sufficient," *United States v. Jones*, 535 F.3d 886, 890 (8th Cir. 2008); and, "the police need not have amassed enough evidence to justify a conviction prior to making a warrantless arrest." *Webster,* 625 F.3d at 442. An officer has probable cause to make a warrantless arrest when the historical facts leading up to an arrest, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause. *Jones*, 535 F.3d at 890.

The events leading up to Mims' arrest are more than sufficient to establish probable cause. Several months before Mims' arrest, Detective Vaughn received information from a confidential informant that Mims was selling crack cocaine; committing violent crimes throughout the Walnut Park and Baden neighborhoods in the City of St. Louis; and was armed and dangerous. The informant told Detective Vaughn about Mims' yellow Ford Mustang and the location of the trap house – both of which Detective Vaughn was later able to corroborate. At the time he received this information, Detective Vaughn was

aware that officers had executed a search warrant on a residence associated with Mims and had seized multiple guns and some marijuana. Detective Vaughn had worked with the informant in the past and he/she had reliably provided information that resulted in arrests and convictions in state and federal court. Detective Vaughn also corroborated information from the informant by conducting his own investigation which revealed that Mims had gang associations, had been arrested in the past for various violent crimes, including crimes involving weapons, and had prior felony convictions. Finally, Detective Vaughn was aware that Mims did not have an active driver's license and that the license plates on Mims' yellow Mustang belonged to a 2013 Dodge Avenger.

The encounter with Mims on September 22nd started, not with a traffic stop, but with a telephone call from the confidential informant. The informant told Detective Vaughn that Mims was parked in the Baden neighborhood at the corner of Wall and Broadway picking up crack cocaine from the trap house and was armed with a handgun. Detectives Vaughn and O'Toole responded to the area in an unmarked car and, as the informant predicted, they observed Mims' yellow Mustang and observed Mims himself leave the alleged trap house and enter the driver's side of the yellow Mustang. Based on their observations of Mims adjusting his pants waistband before entering the car, the officers believed Mims was armed. The officers then observed Mims engage in what appeared to be two hand-to-hand drug transactions without getting out of his car. Mims then left the area in his yellow Mustang.

At this point, the officers had reasonable suspicion, if not probable cause, to suspect that Mims was engaging in criminal activity – namely, drug trafficking. As such, they would have been justified in conducting an investigatory stop of Mims. *Terry v. Ohio,* 392 U.S. 1, 27 (1968) (holding that brief seizure by police officers that fall short of traditional arrests are governed by the Fourth Amendment and are lawful when justified by reasonable articulable suspicion that an individual is engaged in criminal activity). However, the detectives decided not to approach Mims without backup in light of information from the informant that Mims was armed and dangerous and in light of their own observations of Mims. Instead, they called for backup and followed Mims.

In the process of following Mims, the detectives observed Mims commit multiple traffic violations including driving without a valid driver's license and driving a vehicle with improper license plates. These traffic violations provided further justification for the officers to seize and otherwise detain Mims. *United States v. Beck,* 140 F.3d 1129, 1133 (8th Cir. 1998) ("It is well established that a traffic violation – however minor—creates probable cause to stop the driver of a vehicle."). Although the traffic violations standing alone may be too slender a reed on which to rest the validity of the officers' subsequent arrest of Mims, as the foregoing factual findings demonstrate, there is much more to support a finding of probable cause for Mims' arrest.

Once the officers decided to approach Mims, Detective Vaughn observed a bag of what appeared to be marijuana protruding from Mims' back pocket. Mims' possession of marijuana coupled with all of the information the detectives had up to that point was more than sufficient to "lead a prudent person to believe that the suspect ha[d] committed or [wa]s committing a crime." *Parish*, 606 F.3d at 486. As such, Mims' arrest was supported by probable cause.

### B. *The pat-down search of Mims and seizure of drugs from his person did not violate the Fourth Amendment.*

After placing Mims in handcuffs, Detective Vaughn conducted a pat-down search of Mims and, in addition to the marijuana, found crack cocaine in Mims' other pocket. Detective Vaughn then placed Mims in the back seat of the police car. When an officer has arrested an individual, "the officer may search the individual's person incident to that arrest and may reach into his pockets." *United States v. Pratt,* 355 F.3d 1119, 1121 (8th Cir. 2004) (citing *United States v. Robinson*, 414 U.S. 218, 226, 236 (1973)). "A search incident to arrest is justified by the concern for officer safety and the need to collect evidence of the offense." *Pratt*, 355 F.3d at 1121.

The facts here justified the warrantless arrest and the search incident to the arrest. As stated above, at a minimum, the detectives had probable cause to stop Mims in connection with their investigation of drug trafficking as well as the traffic violations they observed. Detective Vaughn's observation of what

appeared to be a bag of marijuana sticking out of Mims' pocket as he approached Mims coupled with the information the officers had leading up to that point provided more than sufficient grounds for the officers' belief that Mims was committing a crime, that he might be armed, and that evidence of that crime would be found on Mims. Because Mims' arrest and the search of his person were supported by probable cause, the contraband discovered and seized from Mims' person subsequent to his arrest should not be suppressed.

### C. *The search of Mims' car and seizure of weapons from the car did not violate the Fourth Amendment*.

"Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or if it is reasonable to believe the vehicle contains evidence of the offense of arrest. When these justifications are absent, a search of an arrestee's vehicle will be unreasonable unless police obtain a warrant or show that another exception to the warrant requirement applies." *Arizona v. Gant,* 556 U.S. 332, 351 (2009). *See also United States v. Tschacher,* 687 F.3d 923, 933 (8th Cir. 2012) (discussing *Gant*). Based on the foregoing factual findings, the detectives were justified in believing that evidence of the offense of arrest would be present in the car – namely, drugs and contraband, including weapons, associated with drug trafficking.

Specifically, at the time they searched Mims' vehicle, the detectives were armed with information from a reliable informant that Mims was engaging in drug trafficking and was armed and dangerous. That information was corroborated, at least in part, by information Detective Vaughn received from another officer; information Detective Vaughn discovered through his own independent investigation into Mims' criminal history; the detectives' observations of Mims on September 22nd; and the fact that Mims possessed what appeared to be marijuana and crack-cocaine at the time of his arrest.

Adding to the justification for the search and seizure of items from Mims' car was Detective O'Toole's personal observation of a gun on the floor of Mims' car. Detective O'Toole observed the gun from outside of the car when he approached the juvenile seated in the front passenger seat of Mims' car

after Mims was arrested. Police may lawfully seize evidence that is in plain view without a warrant if police did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed and if the incriminating character of the evidence seized is immediately apparent. *See Horton v. California,* 496 U.S. 128, 136-37 (1990); *United States v. Mathias,* 721 F.3d 952, 957-58 (8th Cir. 2013) (holding that fact that officer observed a protected area – defendant's fenced-in backyard – from an unprotected area – an open field – did not violate the Fourth Amendment where officer had a right to be in the unprotected area). Both requirements are met in this case. Detective O'Toole did not violate the Fourth Amendment by standing outside the passenger window of Mims' car following Mims' arrest. He arrived there to inquire into the identity of the front seat passenger who appeared to be a juvenile. Upon approaching the juvenile, Detective Mims looked into the car and observed the gun on the floor of the car. In addition, the incriminating nature of the gun was immediately apparent. Mims, the driver, was in custody for alleged drug possession and was a convicted felon who should not have been in possession of a gun.

For all of these reasons, Mims' motion to suppress evidence seized from his car should be denied.

### D. *Mims' contention that the officers lacked jurisdiction to arrest him in St. Louis County does not justify application of the exclusionary rule*.

Mims argues suppression is warranted because the detectives did not have jurisdiction to arrest him once he travelled from St. Louis City into St. Louis County. This argument lacks merit for at least two reasons. First, as the United States pointed out in its post-hearing brief, Missouri courts have consistently held that certified St. Louis City officers like Detectives O'Toole and Vaughn are authorized under Missouri law to effect arrests in St. Louis County. *See* Govt.'s Post-Hearing Br. (Doc. 74), at p. 8, and cases cited therein. Second, even if Mims is correct, the statutory violation he alleges does not justify application of the exclusionary rule. The Eighth Circuit has repeatedly held that the exclusionary rule is typically available only for violations of constitutional magnitude, not for statutory or treaty violations. *See, e.g., Downs v. Holder*, 758 F.3d 994, 998 (8th Cir. 2014) (holding that "in criminal cases, the

primary justification for the exclusionary rule is the deterrence of police conduct that violates Fourth Amendment rights" and refusing to apply the exclusionary rule to an alleged violation of the Federal Educational Rights and Privacy Act (FERPA) in a civil removal hearing) (internal quotation marks omitted); *United States v. Hornbeck,* 118 F.3d 615, 618 (8th Cir. 1997) (cautioning courts in criminal cases to be wary of extending the exclusionary rule to violations not of constitutional magnitude and refusing to apply the rule where defendant's sole basis for suppression was that evidence was seized from his home in violation of tribal law and the alleged violation was "not of constitutional magnitude"). Courts should apply the exclusionary rule "only where 'its remedial objectives are thought most efficaciously served,'" after balancing "the benefits of deterrence against the costs of excluding the evidence, particularly the social costs of 'letting guilty and possibly dangerous defendants go free.'" *United States v. Hamilton,* 591 F.3d 1017, 1027-28 (8th Cir. 2010) (quoting *Arizona v. Evans,* 514 U.S. 1, 10 (1995) and *Herring v. United States,* 555 U.S. 135, 138 (2009)) (internal quotations omitted)).

For the reasons outlined above, this case does not involve a constitutional violation by Detectives Vaughn and O'Toole. Rather, the Court is confronted with what is, at most, a questionable violation of a state statute governing the jurisdiction of local law enforcement. Assuming, without deciding, that such a violation in fact occurred, there is no basis for applying the exclusionary rule because, other than the alleged statutory violation which appears to be primarily technical in nature, the officers' arrest and subsequent search and seizure of Mims' person and car comported with the requirements of the Constitution.

## II. MOTION TO SUPPRESS STATEMENTS (DOC. 37)

Mims contends the statements he made to Detective Vaughn at the scene and at the station following his arrest on September 22, 2015, as well as statements he made to an Assistant Circuit Attorney the day after his arrest should be suppressed, first, because they were the fruit of a violation of Mims' Fourth Amendment rights and, second, because they were given in violation of the Fifth Amendment.

### A. *Mims' statements did not flow from a Fourth Amendment violation.*

Mims posits that because the stop of his vehicle, his arrest, and the search of his person and car violated his Fourth Amendment rights, any subsequent statements should be inadmissible under the exclusionary rule. *See* Deft. Br., (Doc. 71), at p. 12. However, for the reasons detailed above, Mims' arrest and the search of his car and person did not violate the Fourth Amendment. As such, Mims' statements are not subject to the exclusionary rule on that basis.

### B. *Mims' statements were not given in violation of the Fifth Amendment.*

Under the Fifth Amendment, "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. In *Miranda v. Arizona*, 384 U.S. 436, 448-450, 455 (1966), the Supreme Court recognized that custodial interrogations have the potential to undermine the privilege conferred by the Fifth Amendment against self-incrimination by possibly exposing a suspect to physical or psychological coercion. To guard against such coercion, the Court established a prophylactic procedural mechanism that requires a suspect to receive a warning before any custodial interrogation begins. *Id.* at 444. Unless a suspect is warned of his Fifth Amendment rights, any pretrial statements elicited from the suspect are inadmissible at trial. *Id.* at 492. *See also Dickerson v. U.S.,* 530 U.S. 428, 444 (2000) (holding that *Miranda* warnings are constitutionally required).

#### 1. *Mims' statements to Detective Vaughn at the scene should not be suppressed.*

Based on the foregoing factual findings, there is no question that Mims was in custody at the time he made statements at the scene. Mims was placed under arrest immediately after being approached by Detective Vaughn and placed in the back seat of the police car in handcuffs. However, before Mims made any statements at the scene, Detective Vaughn advised Mims of his *Miranda* rights. Specifically, Detective Vaughn testified, credibly, that after securing the weapons found in Mims' car, he read Mims his *Miranda* rights from a card and Mims indicated he understood his rights. Before Detective Vaughn could ask any questions, Mims stated that both firearms were his. This statement, which was voluntarily and spontaneously uttered, is not protected under *Miranda*. *See United States v. Hatten*, 68 F.3d 257, 262

(8th Cir. 1995) (even when a suspect is in custody, "a voluntary statement made by a suspect, not in response to interrogation, is not barred by the Fifth Amendment and is admissible with or without the giving of *Miranda* warnings."). As such, even if Detective Vaughn had failed to advise Mims of his *Miranda* rights, Mims' statement that both guns were his would be admissible.

That being said, ***all*** of the statements Mims made at the scene, including his description of the two firearms and his reasons for purchasing them, are admissible. After being advised of his *Miranda* rights, Mims waived those rights by volunteering that both guns were his and then by responding to Detective Vaughn's request that he describe the firearms. Mims also volunteered that he had recently purchased the firearms from "Crack Head Charlie" because his girlfriend and been recently robbed and he believed he was the target of the robbery.

It is well settled that the privilege against self-incrimination can be waived. *Maryland v. Shatzer*, 559 U.S. 98, 104 (2010). To establish a valid waiver, the Government must demonstrate by a preponderance of the evidence that "the waiver was knowing, intelligent, and voluntary[.]" *Id.* The standard for determining the voluntariness of either a waiver of *Miranda* rights and/or a statement is the same. *Colorado v. Connelly,* 479 U.S. 157, 169-70 (1986). "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *United States v. Boslau,* 632 F.3d 422, 428 (8th Cir. 2011) (quoting *United States v. LeBrun,* 363 F.3d 715, 724 (8th Cir. 2004)). This determination must be made by looking at the totality of the circumstances, including both "the conduct of the officers and the characteristics of the accused." *LeBrun*, 363 F.3d at 724. Factors include, among other things, "the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." *Boslau*, 632 F.3d at 428 (quoting *Sheets v. Butera,* 389 F.3d 772, 779 (8th Cir. 2004)). Although "[t]he government bears the burden of persuasion and must prove by a preponderance of the evidence that the challenged statements were voluntary," *LeBrun,* 363 F.3d at 724, "[c]ases in which a defendant can make a colorable argument that a self- incriminating

statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Berkemer v. McCarthy,* 468 U.S. 420, 423 (1984). "The fact that such warnings were given weighs in favor of a voluntariness finding." *United States v. Mendoza,* 85 F.3d 1347, 1350 (8th Cir. 1996).

Based upon the totality of the circumstances surrounding Mims' statements to Detective Vaughn at the scene, the United States has met its burden of establishing a voluntary statement and/or waiver. Detective Vaughn's hearing testimony about his discussions with Mims at the scene is supported by the audio recorded interview at the station which occurred shortly after Mims' arrest. On the recording, Mims sounds like a well-spoken, intelligent man who was in full control of his faculties. The recorded discussion also suggested that, as Detective Vaughn indicated, Mims and the detective had prior discussions at the scene about Mims' ownership of the guns found in his car. Based on my observations and questioning of Detective Vaughn at the hearing, and observations of Mims during Detective Vaughn's testimony, I have no reason to question the veracity of the detective's hearing testimony that before Mims made any statements about the guns found in his car at the scene, he advised Mims of his *Miranda* rights and Mims understood those rights. In sum, Mims' statements at the scene should not be suppressed because Mims voluntarily made those statements after being advised of his rights, and after indicating that he understood his rights.

### 2. *Mims' audio recorded statements to Detective Vaughn should not be suppressed.*

As the foregoing factual findings demonstrate, after booking Mims at the station on September 22nd, Detective Vaughn again advised Mims of his rights by reading from a form that included both *Miranda* rights and a section providing for a written waiver of those rights. After acknowledging both in writing and orally that he understood his rights, Mims knowingly and voluntarily waived his *Miranda* rights. Mims' written waiver of his rights followed by his audio recorded statements make clear that Mims knowingly and voluntarily made statements to police after being advised of his *Miranda* rights.

As discussed above, a review of the audio recording reveals a well-spoken individual in full control of his faculties. The audio recording also demonstrates that the interview was relatively brief and cordial. In addition, both Mims and Detective Vaughn sounded composed and calm throughout the interview. In sum, there is no evidence before this Court to suggest that Mims' will was overborn or that his audio recorded statements to Detective Vaughn were anything but voluntary. As such, Mims' motion to suppress the audio recorded statements he made to Detective Vaughn should be denied.

### 3. *Mims' video-taped statements to the Assistant Circuit Attorney should not be suppressed.*

The day following his arrest, Mims, who was still in custody, was interviewed by a prosecutor in the St. Louis City Circuit Attorney's Office. Before Mims was asked any questions, he was read his *Miranda* rights, including the right to be represented by an attorney, from a form. The prosecutor confirmed that Mims understood his rights and explained that she was not there to represent Mims; rather, she told him she worked for the state and they were reviewing the case. Mims indicated that he understood and indicated his willingness to speak with the prosecutor. Mims then proceeded to make incriminating statements.

In moving to suppress statements he made to the Assistant Circuit Attorney, Mims acknowledged that he was advised of his *Miranda* rights. However, Mims has challenged as "horrific" and "vile" the practice of a trained lawyer (whose objective is to prosecute the accused) interviewing an uncharged, unrepresented suspect under the guise of gathering the accused's side of the story prior to making a charging decision. *See* Deft.'s Br. (Doc. 71), at p. 14. Mims contends that the tactic used by the Assistant Circuit Attorney in this case was nothing less than a trick by a highly educated attorney who had already decided that Mims would be charged criminally and whose only intention was to get Mims to confess his crimes on videotape. *Id.* As a result of this trickery, Mims contends, his will was overborn.

The undersigned shares defendant's concerns about the inherent unfairness that might arise from a practice that appears designed to invite a suspect to try to talk his way out of charges without the benefit

- 16 -

of counsel. However, defendant has failed to point to any authority, and the undersigned has found no authority, that this practice, standing alone, rises to the level of a constitutional violation. There are several reasons why Mims' motion must fail in the absence of additional evidence to support a finding that his statements were coerced. First, there is no dispute that Mims was advised of his *Miranda* rights including the right to remain silent and the right to counsel. There is nothing in the record before the Court to suggest that Mims did not understand his rights or attempted to exercise either his right to counsel or his right to remain silent. Rather, the videotaped interview reveals a suspect who appeared to understand his rights but nevertheless opted to cooperate and speak openly with the prosecutor.

Second, even if the interview amounted to trickery as Mims asserts, "[c]ourts have been reluctant to deem trickery by the police a basis for excluding a confession on the ground that the tricks made the confession coerced and thus involuntary. . . . Far from making the police a fiduciary of the suspect, the law permits the police to pressure and cajole, conceal material facts, and actively mislead" a suspect into making a confession. *Aleman v. Village of Hanover Park,* 662 F.3d 897, 906 (7th Cir. 2011). The undersigned recognizes that, as attorneys, prosecutors are held to a different standard than police. However, notwithstanding Mims' unsubstantiated assertions to the contrary, there is no evidence that the Circuit Attorney's office had already made a decision to charge Mims before the interview. Nor is there any evidence that the Assistant Circuit Attorney made any false statements during her videotaped discussion with Mims. Indeed, there is no evidence before the Court that the Assistant Circuit Attorney violated any professional code of conduct in her interactions with Mims.

Third, the Eighth Circuit Court of Appeals has held that the standard for determining whether authorities impaired a defendant's capacity for self-determination is "very demanding." *See LeBrun*, 363 F.3d at 727. That standard requires the court to consider, not only the conduct of the interrogator, but the duration of the interrogation, and the defendant's attributes such as his intelligence, education, mental state, and any other factors possessed by the defendant that "might make him particularly suggestible, and susceptible to having his will overborne." *Id.* at 726-27. Under that standard, law enforcement may make,

and break, promises not to prosecute and may even resort to psychological tactics to trick a suspect into making a confession without running afoul of the Fifth Amendment if, under the totality of the circumstances, the defendant's capacity for self-determination was not impaired. *See Boslau,* 632 F.3d at 428-29 (holding the fact that an officer may have "elicited a confession through a variety of tactics, including . . . making false promises . . . does not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne"); *LeBrun*, 363 F.3d at 726-27 (holding defendant's will was not overborn although interviewing agents repeatedly told defendant he would not be prosecuted for the crime and one agent posed as decedent's cancer-stricken brother; interrogation was brief and defendant was educated and otherwise in control of his mental faculties); *Tippitt v. Lockhart,* 859 F.2d 595, 598 (8th Cir. 1988) (holding the government's promise to a defendant not to prosecute him for capital murder in exchange for a confession did not render the confession involuntary); *United States v. Larry,* 126 F.3d 1077 (8th Cir. 1997) (holding defendant's inculpatory statement was voluntary even though it was induced by a promise that defendant would not be prosecuted for a separate offense).

In sum, the facts here do not meet the "very demanding" standard required to establish that Mims' will was overborn. The interview by the Assistant Circuit Attorney was relatively brief and cordial. After Mims was read his rights (for a third time since his arrest) the Assistant Circuit Attorney began the interview by warning Mims that although she was a lawyer she was not there to represent Mims; that she worked for the Circuit Attorney's office; and that her office was considering charges. There were no officers present once the interview began and Mims appeared to be at ease throughout the interview. Mims' education level was not established on the record but, as described above, Mims was well-spoken and appeared to be in full control of his mental faculties.

In sum, other than the fact that Mims' second post-arrest interview was conducted by an Assistant Circuit Attorney, there is precious little in the record to support Mims' contention that his will was overborn or his confession was coerced. Mims' motion should be denied because the evidence as a whole

- 18 -

does not demonstrate that Mims' capacity for self-determination was impaired and because the fact that Mims was interviewed by an Assistant Circuit Attorney, standing alone, is not a sufficient basis for finding that that his statements were coerced.

## **CONCLUSION**

For all of the foregoing reasons, Mims' motions to suppress evidence and statements should be denied, and the United States' motion for pretrial determination of the admissibility of Mims' statements should be granted.

/s/ Shirley P&M
_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 24th day of June, 2016.